In this case, Geoffrey Fogg, and I would like to reserve five minutes for rebuttal, if your Honors, please, this is a 2254 challenge by my client, Mr. Fogg. It has somewhat of a complicated procedural history going from the Delaware Supreme Court back to the Delaware Superior Court for a number of remands. Eventually, the Delaware Supreme Court affirmed his conviction. He filed post-conviction proceedings, and again, there were remands back to the Superior Court of Delaware. I think we're well aware of the procedural history and why we're here today. But maybe you could bring us up to date on the recent history. What is the status of the Brady violation proceeding? Well, as I understand it, Mr. Richmond was not available during the post-conviction proceedings because he was in another state. As I understand it, he has now been brought back, and those proceedings are now going to be taking place in the State of Delaware on the post-conviction. I thought they had taken place. I'm sorry? I thought they had taken place. I don't believe she's in on the proceedings either, but I know those proceedings are. I thought it was found to be no Brady violation. I don't know where. Yes. Why don't we ask your learned adversary? Oh, in the Supreme Court. Okay. Okay. Okay. What happened to Mr. Andrus? He was convicted, was he?  And what was he sentenced to? He will probably be proceeding also in the Delaware courts. So the issues before Your Honor today have to do, number one, with the Bruton violation, and two, with the bad acts, bad character. Right. And what is the test that we review the error in the trial court here? Well, whether it was harmless error or not, I believe that that's where the Delaware Supreme Court, and that's what Judge Robinson in the district court used the standard here. We are arguing, obviously, that it was not harmless error, even though that those conclusions were found against us, and we are saying that the attorney for Mr. Fogg was ineffective for not bringing up the Bruton issue, or even under Richardson v. Marsh, the redaction issue. And it appeared in the transcripts that I've read as to the hearings that took place, he didn't even seem to be familiar with what the law was on this point. Now, obviously, I'm sorry. When you say harmless error, are you talking about Breck v. Abramson? Well, we're talking about the Frye standard as it adopted Breck v. Abramson. And we are saying that here there was substantial problems with what was taking place, and that it was not harmless error. Mr. Richmond testified to a number of conversations that Mr. Andrus made to him in Gander Hill, all of them implicating my client. Now, I believe Judge Robinson's analysis was, well, that there was so much other evidence in this trial, including the statements made by Mr. Fogg, that it had to have been harmless. We would disagree with that because we would submit that, if anything, the statements that were admitted were enough to find him guilty of the first-degree murder. And if that was not admitted, the statements by Mr. Richmond, obviously the State would not have been able to. So you're focusing on the intent to get first-degree murder? Well, I'm focusing on the intent at a minimum. Well, that seems to me to be your strongest argument. Tell me why there wasn't sufficient circumstantial evidence to show intent in the first-degree murder without the statements. Because without the statements, I mean, even if you look at Mr. Fogg's statement himself, which Judge Robinson seemed to place a lot of emphasis on, his statement was, I spazzed out, or I had a problem, or I may have hit him. But there was nothing in that statement whatsoever that would indicate that he had the intent to kill Mr. Dilley. What about the brutality of the crime and all of the other indicia of the beatings? Well, I believe that what his attorney was trying to show is that this was basically done by the co-defendant, Mr. Andrus, and that my client was not really involved in the total brutality of the crime. Mr. Andrus was physically disabled. I mean, I gather, was he competent to inflict the injuries to the extent that they were inflicted? Well, it would appear that the jury found he was not. I mean, he was not, because Andrus, because of his disability, couldn't inflict those injuries, and he could do some, but to the extent there were the injuries that Andrus couldn't do it, and there's support for the jury determination on that, isn't there? Well, I think there was some conflict about the shoe and whose shoe it was that was stomping on Mr. Dilley, but we would disagree that there was enough support to find him guilty, to find my client guilty of the first-degree murder without the corroboration of Mr. Richman's statements, and that's why we're contending that it was. Can the extent of injuries be evidence of first-degree murder? The extent can be evidence, assuming the jury finds out who actually was responsible for having committed it, and again, all of the things that Mr. Richman said were just so highly prejudicial to my client that. . . Even without what he said, the extent of the injuries is something the jury could consider in finding whether there was premeditation or not, is it not? Well, the jury could consider that, yes, Your Honor. The other issues that Your Honor has asked us to look at was the bad acts and bad character evidence that was admitted under 404B, and in that particular situation, there were a number of fights that were alleged to have taken place between my client and another individual shortly before the murder, as well as there was testimony by a lady as to the fact that my client the night before trashed her hotel room and was drunk. These also went into the trial without any objection made by the trial counsel as to the fact of their prejudicial nature as to bad acts and not relevant to the thing before them. What was the strategy of trial counsel? Well, his strategy, and again, it appeared that, my reading of it, that he was not familiar that he could object to this. His strategy was to show, well, the injuries that he had to his hand, which the State was trying to show came from the infliction of damages on Mr. Dilley, probably came from the fights that he was involved in prior to this. But I would submit that that was a fairly weak argument that he was making, and plus he never asked for a limiting instruction from the trial judge. I believe his point was, well, I didn't want to emphasize it, so I never asked the trial judge for a limiting instruction. But the jury had already heard that my client was in a fight the night before, that he was drunk, that he trashed a hotel room, and that he got into fights with other people. And at a minimum, even if his strategy was to say, well, these injuries came from the fact not of this murder before the jury, but from other incidents, he should have at least, since the jury has heard this, asked the judge to give a limiting instruction, and he did not do that whatsoever. So we are submitting that he was ineffective on those grounds also. It's also interesting that the Delaware Supreme Court, sue Esponti, brought up the Bruton issue. That was not even brought up on direct appeal, and the Delaware Supreme Court thought that this was an issue, and that's why they brought it up, and they asked that it be briefed on the issues, and then it was sent back to the Delaware Superior Court to have a hearing on that. That would be all I would have, I'm not sure. Roberts. Okay. Any other questions? Go ahead.  Thank you, Your Honors. Thank you, Mr. Levin.  We'll have you back. Ms. McFarland. Good morning, Your Honors. Good morning. Elizabeth McFarland on behalf of the state of Delaware-Appalachia. Let me start you out with a question. Certainly. Let's assume without getting into it that there was sufficient evidence here to support a first-degree murder conviction without Richard's testimony. Yes, sir. On the other hand, is it not true that without Richmond, all the state had to rely on with respect to intent to kill  And while it was severe indeed, it was consistent with a drunken brawl without an intent to actually kill anybody involved. And we've got Richmond here, and Richmond's testimony is that Fogg was responsible, got carried away, and was responsible for the death. And beyond that, he said when he started to get out of control, I'm going to kill your ass. Your Honor, respectfully, the jury never heard that remark. That was in the notes. Pardon me? The jury never heard Fogg's statement that he wanted to kill him. That was never before the jury. Mr. Richmond did not testify to that. It was in his notes, which were originally admitted but had been stricken before the jury deliberated. But he knows that the jury didn't look at them. They did not see the notes. They heard the testimony. Those notes were used to refresh the recollection. They never went back to the jury. There was never any testimony as to that. What went back to the jury was the videotaped police statement and the transcript, and that was not in either of those. The transcript of the video? Police statement and the audio of that statement. So the jury never heard Fogg say he intended to kill. That was never there. Richmond did not bring that. In terms of the sufficiency in what Richmond added to a first-degree murder, he didn't really add anything in that Fogg and Andrus were already placed at the scene. There was evidence that they both participated. There were the pattern injuries. There were Fogg's admissions. It comes down to Richmond's statement that he went too far versus Fogg's own statement that he upset me and I spazzed out on him. The difference there is really a difference without significance. Fogg himself was admitting that, well, I lost control. Once again, neither of those statements really goes toward intent in terms of intent to kill. That's correct. So Richmond's testimony really didn't add an intent element that wasn't already there, which was the brutality of the killing, the attempt to clean up afterwards. It wasn't just the brutality, the fact that they were there and then tried to clean up the mess. But cleaning up is not inconsistent with a drunken brawl either. That is true. It would be the State's contention was that anyone who was beaten that severely, and this is often the case in murder, more often than not in murder cases, there is clearly no direct evidence of intent other than the facts surrounding the crime itself. I guess maybe I didn't ask the question properly. But I don't see where the – I think the cleaning up obviously is indicative of culpability, but not necessarily of first degree. I think the brutality is indicative of first degree, and that may be a jury issue. The State would agree, but the sense of some sort of culpability adds to both a lesser degree and certainly an intent or a recognition that they had committed some sort of crime, and that the State always puts in when available the consciousness of guilt evidence in terms of proving guilt of a crime. I would agree that it does not differentiate between the levels of murder one and murder two. If Richmond's testimony was that insignificant, why was it repeatedly mentioned during the course of the trial and in the closing remarks? And even when the judge addressed the motion for judgment notwithstanding the verdict, the evidence that the court referred to with respect to intent to kill was Richmond's, wasn't it? There was mention of that, yes, by the trial judge. However, in closings, for example, none of the parties spent more than approximately 13 percent of their discussion related to Richmond or his testimony. The primary focus was on the incredible brutality of this crime and the relative culpability of the two. The defense at trial was really an attempt to get a lesser included. There was no way to avoid conviction on something given that three went in, two came out, there's no other explanation. So to that extent, I can't explain why the judge put so much reliance on that. The State would contend that that really wasn't necessary because there was plenty of evidence without that. The jury was given a lesser included offense to consider? They were given murder two and two different versions of manslaughter, reckless and criminal negligence. And what did the defense argue with respect to the lesser included? Both defense counsel for Anderson-Fogg were arguing that there was no intent to kill in this case, that the State had failed to prove that intent and that clearly one, the Fogg's attorney was attempting to show that his statement had been coerced and that he never really admitted that they were too drunk to have formed intent and that this was just a case of a fight that went too far. And that was the argument pretty much on both sides that it was one, it was the co-defendant who participated to a greater extent than that defendant and that there was no intent here. And they argued specifically, they used Richmond's testimony specifically to show that they tried to revive Mr. Dilley immediately following the fight. And in fact, that was the only evidence of that. So without Richmond's testimony, there would have been difficult to argue that. The only other evidence of that was Fogg's own statement. So Richmond, in fact, helped with the argument for a lesser included that they really didn't think they had killed him. They tried to revive him. They didn't intend to kill him. So in that sense, it truly is harmless because the defendant, excuse me, Fogg's counsel used that information to his advantage in arguing for a lesser included. Unless there's some further questions on the intent issue, that moves us into the prior bad acts. I guess your argument is that the prior bad acts served to show that this was a drunken brawl rather than first degree murder. The bad acts came in, one, because once the motion to suppress Mr. Fogg's statements was denied, counsel then wanted to use his statement to police to show that he was coerced. And so the statements by the police that incorporated some alleged bad acts were part and parcel of his argument that Fogg's statement was coerced, and that's why those were not redacted out. Then the fight the night before at Cheryl Adams' motel room was specifically included to account for the injuries to Mr. Fogg's hand. The remaining bad acts, if you want to call it that, which are not really prior bad acts because they were part and parcel of this incident, were precisely that, the leading up to the event, and most likely could not have been excluded even had counsel attempted to have those excluded because this was the lead up to the murder itself, showing the circumstances of it and potentially motive. In addition, those alleged bad acts showed that Fogg, one, wasn't fighting with this victim, that was Mr. Andress who punched this victim. Mr. Fogg's argument had been with someone else entirely. Also, at the end, they had moved on and that was the end of that. It showed that Mr. Fogg, although, yes, he might have gotten into drunken brawls now and then, certainly did not, once again, intend to kill anyone. They were just sort of a boys will be boys, had too much to drink type of behavior. And this was the argument on behalf of his defense counsel for him. So there's no reason to believe that these would have, one, been excluded, and second, counsel did have.